**In the United States District Court for the Northern District of Indiana**
**Fort Wayne Division**

Cause No.  1:17-00136-TLS-SLC

Joseph Castellanos,
Bethany Castellanos, and
Michael F. Ponder,
     Plaintiffs

Vs.

National Legal Staffing Support, LLC,
Kevin P. Mason,
GM Law Firm, LLC,
K. Stuart Goldberg PLLC,
K. Stuart Goldberg,
     Defendants

_____/

**FIRST AMENDED COMPLAINT – Jury Trial Demanded**

Plaintiffs, Joseph Castellanos, Bethany Castellanos and Michael F. Ponder, for their complaint

against the defendants, state as follows:

OVERVIEW

1.    This complaint relates to a debt settlement scheme perpetrated against the plaintiffs

by the defendants in a joint enterprise, using interstate telephone and mail.

PARTIES

2.    Plaintiffs Joseph and Bethany Castellanos are adult natural persons, a married couple,

who at all times relevant to this complaint resided in Allen County, Indiana.  Plaintiff

Michael F. Ponder ("Ponder") is an adult natural person who at all times relevant to

this complaint has resided in St. Joseph County, Indiana.

1

3.  Defendant National Legal Staffing Support, LLC (hereinafter "National Legal Staffing" or "NLSS") is a Delaware limited liability company with principal place of business as 1515 South Federal highway, Suite 113, Boca Raton, FL 33432.

4.  K. Stuart Goldberg PLLC (also known as – doing business - as Stuart Goldberg PLLC), is a Florida professional limited liability company with principal place of business as 23257 State Road 7, Ste. 203, Boca Raton FL 33428.  K. Stuart Goldberg is a natural person, a lawyer licensed to practice law in Florida, place of residence unknown but with principal place of business in Boca Raton, Florida.  Hereinafter both the organization and the individual will be referenced as "Goldberg

5.  Kevin P. Mason is an adult natural person, a lawyer licensed to practice law in Florida, with a place of residence unknown but a principal place of business as 1515 S. Federal Highway, Suite 105, Boca Raton, FL 33432. GM LAW FIRM, LLC. Is a Florida Limited Liability Company with principal address of 1515 S. Federal Highway, Suite 105, Boca Raton, Florida 33432. Kevin P. Mason is listed as Manager of GM Law Firm, LLC on the records of the Florida Division of Corporations. GM Law Firm, LLC is the successor entity via conversion by Kevin Mason, P.A. Hereinafter, Kevin P. Mason and his business organizations in this paragraph will be referenced as "Mason".)

JURISDICTION AND VENUE

6.  Federal Court Jurisdiction lie under 15 USC 6104(a) for the Telemarketing and Consumer Fraud and Abuse Prevention ACT (TCFAPA) and for violations of the Federal Trade Commission rules implementing that act.

7. Federal Court Jurisdiction for the Telephone Consumer Privacy Act is based on 47 USC 227(b)(3), and the general federal question jurisdiction statute, 28 USC 1391(b).

8. Diversity Jurisdiction is present as all plaintiffs are residents of Indiana and all Defendants are residents of other states and the amount in Controversy exceeds $75,000.  28 USC 1332.

9. Supplemental jurisdiction over state law claims is pursuant to 13 USC 1367.

10. Venue is proper in this court pursuant to 28 U.S.C. 1391(b)(1) because this district is where all plaintiffs reside. Under 28 U.S.C. 1391(c), a defendant corporation shall be deemed to reside in any judicial district in which it is subject to personal jurisdiction. All of the defendants are subject to personal jurisdiction in Indiana because they have on a routine basis solicited Indiana consumers for debt relief contracts, and they have received money on these contracts from consumers based in Indiana.  They have caused harm to consumers in Indiana. They have expressed opinions concerning the legal status of contracts entered into in Indiana, asserting competence in determining the legality of issues governed by Indiana law; effectively engaged in the practice of law in Indiana.  They have therefore purposefully availed themselves of the laws of Indiana.

FACTUAL ALLEGATIONS RELATING TO JOSEPH AND BETHANY CASTELLANOS

11. On or about April 6, 2015, plaintiff Joseph Castellanos answered a phone call placed to his personal cellular phone number, 260-920-0245. Upon information and belief of the plaintiff, this was an interstate call and was placed using an automated dialer.  The caller identified himself as Charles Grainger fromeEither National Legal Staffing or National Legal Staffing Support calling on behalf of attorney Stuart Goldberg.

Grainger seemed to know that Joseph Castellanos was having difficulty making his student loan payments, even though Joseph had never had any contact with Grainger, his company or attorney Goldberg.

12. In the phone call from the paragraph above, Grainger presented Joseph Castellanos with a sales pitch to the effect that Mr. Castellanos could continue making payments to the student loan companies for triple what he originally owed (after interest) or he could sign a contract with Goldberg and start making payments to Goldberg's law firm for considerably less, roughly half the balance of the accounts. Grainger represented to Castellanos that they (National Legal Staffing and Goldberg) would build his case file and leverage consumer protection violations to get debt dismissed. Grainger told Castellanos that once the retainer was paid in full he would never have to deal with the student loan companies again, and they were completely confident that they could get the debt dismissed. They were so confident that if there was a settlement, they would pay the creditors that amount. As Castellanos understood from the phone call, all he was responsible for was the retainer.   They would build a case file for Castellanos and leverage consumer protection violations to get the debt dismissed.

13. After Grainger spoke to Castellanos on the phone, Castellanos was forwarded on the phone call to a person who identified himself as Stuart Goldberg. On information and belief, it was defendant K. Stuart Goldberg.  Goldberg substantially reiterated the points raised by Grainger, that by using consumer protection laws, they could get the loans dismissed, and that there was no other way that Castellanos would ever pay off his student loans.  The conversation with Goldberg was short, and Goldberg did not

4

ask detailed questions to inquire about the legitimacy of the accounts or the collection activities that might be FDCPA violations.

14. Shortly after this phone call, approximately April 6 or April 7, 2015, National Legal Support sent Joseph Castellanos a link to a "Docusign" online contract under the letterhead of Stuart Goldberg PLLC and is identified as a "Limited Scope Legal Services Agreement. The contract is dated on its face as 4/6/2015; however, the effective date of the agreement per Section 3 of the agreement is upon the execution by both parties, when both parties have signed it. Castellanos never received a copy signed by Goldberg. A copy of this document (with account numbers redacted) is attached as EXHIBIT 1. Stuart Goldberg PLLC is not a registered business name as far as the plaintiffs have been able to tell. Upon information and belief of plaintiffs, it is a "doing business as" name for both K. Stuart Goldberg the individual and Stuart Goldberg the professional limited liability company.

15. The Limited Scope Legal Services Agreement called for Castellanos to pay a "NON-REFUNDABLE" fee of $31,674, paid in monthly installments of $659.88 per month for 48 months. It also states that "Client understands and agrees that the Attorney may sell the Installment Note to a third party."

16. The contract provided a space for Castellanos to list his student loan, credit card and unsecured debt accounts. The nonrefundable fee was roughly half the amount of the debt listed. In exchange for the money paid, Goldberg listed the services that he would provide. The contract states: "First, unlike the usual agreement, this Agreement is for a (a) **limited** legal service(s), rather than for the complete array of services that Attorney could provide to his clients in the pre-litigation and litigation

phases of a dispute." The contract also states that "the total fee will be less than it would be if Attorney was not limiting what it was to do, because the cost of legal services increases as the scope of those services increase."

17. The contract defines the "Scope of Legal Representation" as the following items (with more complete descriptions in the contract attached.)

    (i)     Letter of Representation and Verification  (to each of the creditors identified by the client);

    (ii)    Auditing of Documents Produced;

    (iii)   Instructions to Client;

    (iv)   Defensive Litigation.  "In the event litigation is initiated against Client, Attorney shall defend Client in such action with such defense [including the filing of any appeals]. Client shall only be obligated to pay the filing fees associated with the filing of an appeal. In regards to clients not residing is the state of Florida, they shall be assigned to of counsel in their state employed by this firm."  Because Castellanos was not a Florida resident, and because pursuant to the Fair Debt Collection Practices Act, a collector was likely to sue him in his home state and county, this contract provision is effectively a litigation insurance policy by a company not licensed to provide insurance.

    (v)    Prosecution of Claims. "In the sole discretion of Attorney, Attorney shall prosecute any claims Client may have against any counterparty or any third party identified during the course of the limited representation."

    (vi)    Settlement of Claims. "Attorney shall cause counterparties and other parties to enter into settlement and release agreements. **THERE IS NO CHARGE TO CLIENT FOR THE SERVICE OF RENEGOTIATING SETTLING, OR IN ANY OTHER WAY ALTERING THE TERMS OF ANY DEBT BETWEEN CLIENT AND ANY UNSECURED CREDITOR OR DEBT COLLECTOR, INCLUDING A REDUCTION IN THE BALANCE, INTEREST RATE OR FEES OWED. THIS SERVICE IS PROVIDED FREE OF ADDITIONAL CHARGE AND IS INCIDENTIAL TO SERVICES I-V ABOVE."** This statement is part of a scheme, device or artifice with intent to mislead or defraud. It is an unsuccessful attempt to avoid coverage as a credit services organization. Since it is one of the services committed, and the other services are not itemized, there is no way to assign consideration to any of the services offered, thus it cannot be said or truthfully claimed that there is no charge for causing counterparties to enter into settlement and release agreements.

18. From the very beginning, Castellanos was required and advised to make the monthly payments on the contract to National Legal Staffing Support using a Card Payment Authorization form. All of Joseph and Bethany Castellanos's communications relating the contract were with National Legal Staffing Support employees until the contract was "taken over" by Kevin Mason in October 2016. Upon information and belief of the plaintiff, the entire Limited Scope Legal Services Agreement was nothing but a sham meant to shield the operation of a traditional Credit Services

Organization from regulation and accountability by hiding behind an attorney as a front. Attorney Goldberg was a knowing participant in this scam and partner in this scam even though upon information and belief, he received only a small portion of the funds advanced by the plaintiff. Neither attorney personally performed a significant amount of legal services for the plaintiffs. Letters sent out the plaintiffs' creditors were form letters that were not signed by the attorneys. If any legal analysis was performed on any prospective offensive or defensive claims, it did not result in any action on the creditor accounts of the plaintiffs. There were no account settlements and no offensive or defensive litigation during the 16-17 months the plaintiffs paid into the plan.

19. The defendants attempted to convey the image to the plaintiffs that NLSS provided support and back office as a contractor to Goldberg and Mason. Plaintiffs believe, however that National Legal Staffing Support was "calling the shots" using attorney Goldberg as a "front". National Legal Staffing received the money and paid Goldberg and Mason rather than the other way around.

20. On or about April 13, 2017, Joseph Castellanos contacted Serge Jerome, JD "Paralegal National Legal Staffing Support" by phone and inquired about adding the debts of his wife, co-plaintiff Bethany Castellanos" to his program.

21. Serge Jerome replied by email 4/17/2015 stating: "I spoke with Stuart today and he said he can work on these accounts but your wife will have to have her own separate case."

22. Bethany Castellanos entered into a Limited Scope Legal Services Agreement with Stuart Goldberg PLLC dated 4/17/2015 that is substantially identical to the one

entered into above by Joseph Castellanos with the exception that the attorney fee listed was a non-refundable fee of $9,905 payable at 275.14 per month for 36 months. A Copy of Bethany Castellanos's contract is attached as EXHIBIT 2.  (redacted of account identifiers)

23. From April 2015 through October 2015, Joseph and Bethany Castellanos made payments under their Limited Scope Legal Services Agreements, and they had repeated email correspondence with a rotating cast of account specialists and paralegals at National Legal Support Solutions, sending into them logs of telephone calls from creditors and copies of bills and dunning letters sent by creditors.

24. As the months went on, Bethany and Joseph Castellanos became increasingly concerned that bills not being paid (because they were in the Goldberg/NLSS/Mason plan) were going increasingly in default and hurting their credit.  Joseph Castellanos raised this concern early on with a question answered by Serge Jerome (resolvly@datasyyncorp.com) Jerome stated "The FICO score will not allow an item that is being actively disputed to harm your score. How does it accomplish this? FICO will not consider an item with the XB [dispute] code present for either its Payment History or Debt related measurements. So if you have an account with late payments and you're disputing those late payments, the FICO score will choose to not consider those late payments. And if you have an account with a large balance and you're disputing the balance, the FICO score will not consider the balance. In the same sense, if you have an account with a positive payment history it will no longer be used in calculating your FICO Score. So the answer to your question is yes, it can have a negative affect on your credit."  By phrasing it this way, National Legal

Staffing Support implied that disputing an account with a large positive balance would negatively affect the credit score by eliminating a positive, but also implied that a negative item would not be scored at all, and therefore, the disputing of the item provided by National Legal Staffing, and the attorney would improve the credit score. This however is a partially false statement, as FICO offers credit score models to creditors that do score accounts that are disputed by consumers.

25. On November 3, 2015, April Garcia, Legal Secretary, National Legal Staffing Support LLC, sent Joseph Castellanos an email stating: "We spoke with you and sent you a new LSA agreement to sign transferring your case to our Lead Attorney Kevin Mason. In order for us to move forward, we must receive that new LSA signed." Neither Castellanos was informed by Goldberg that he was resigning as their attorney. Goldberg did not send a resignation letter or an accounting. National Legal Staffing implied that the Castellanos's must continue with a new attorney selected by National Legal Staffing.  This shows that National Legal Staffing was calling the shots and not Goldberg.

26. Bethany Castellanos executed a Limited Scope Legal Services Agreement with Kevin Mason P.A. dated October 28, 2015. A copy of this contract is attached and incorporated as **EXHIBIT 3** (redacted for account numbers).  This contract is similar but not identical to the contract she executed with attorney Goldberg. It calls for payment of a non-refundable attorney fee of $9,905.00 at a rate of $275.14 per month for 36 months, which is exactly the same as the Goldberg contract, even though Bethany Castellanos had been paying for approximately 7 months at that point.  This

contract was the result of telemarketing interstate phone conversations, incoming and outgoing with NLSS as agent for Mason.

27. Joseph Castellanos executed a Limited Scope Legal Services Agreement with Kevin Mason on November 3, 2015.  This contract is similar but not identical to the contract executed with Goldberg. It calls for a non-refundable attorney fee of $31,674 payable on a monthly basis of $659.88 for 48 months, the same as the contract with Goldberg. A copy of this agreement (redacted of account info) is attached as **EXHIBIT 4.**  This contract was the result of telemarketing interstate phone conversations, incoming and outgoing with NLSS as agent for Mason.

28. There was no cancellation of the contract with Goldberg which was theoretically nonrefundable and not conditional on further work by Goldberg. Taken literally, between the two contracts, Mr. and Mrs. Castellanos contracted to pay virtually the full amount of their debt to the two attorneys and their assignees.   Though it was implied by NLSS and Mason that the Mason contracts replaced the Goldberg contracts and were effectively a continuation of the relationship with NLSS, the contracts on their face are independent assignable contracts with unconditional promises to pay the full amount of the contract.

29. When Mason became involved with the plaintiffs, Mason adopted the policies and the conduct of NLSS, and went along with the NLSS line that the contract with Goldberg was still in effect. Mason therefore so far engrained himself into the operations of NLSS that liability of NLSS is imposed upon Mason as a joint venture participant.

30. Even though Goldberg stopped being actively involved before the end of NLSS's dealings with plaintiffs, Goldberg never resigned from representation of the plaintiffs.

11

Goldberg never sent an accounting or offered a refund for services not performed. Goldberg never took corrective actions to remedy false apprehensions of continued legal services which were continued by NLSS, and Goldberg knew or should have known of the continued operation against the plaintiff. Goldberg is therefore liable for actions jointly through the end of the enterprise.

FACTUAL ALLEGATIONS RELATING TO MICHAEL PONDER

31. In March 2015, Michael Ponder was distraught because of difficulties paying his private student loan that was serviced by American Education Services. Even though he had already paid more than the principal amount of the loan, his required payment of $365/month was roughly 20% of his income, and he couldn't pay the loan and provide for his family. Nevertheless, not only was he current on the loan in March 2015, he had paid ahead several months after dedicating much of his tax return check to the loan. He did some research on line regarding options to lower his debt payments without much success. On or about March 18, 2017 he received a call to his cellphone # 574-339-8069. It was a prerecorded voice, that said asked if he could benefit from relief from private student loans, and to press "1" to talk to a representative.  Because the message was in the nature of a prerecorded voice, Ponder concluded that the call was placed by an autodialer.  He pressed 1 to talk to a representative. The representative said that he worked for attorney Stuart Goldberg. The representative asked Ponder questions about his student loan. The representative told Ponder that this was definitely a predatory loan, and they could help him out. The representative explained the program and said the program called for him to stop making payments to the lender.  Upon information and belief this representative was

an employee of NLSS and was not a lawyer.  The representative sent Ponder an email

with link to documents including the DOCUSIGN contract.

32. The representative told Ponder the program called for Ponder to make payments of

about half of the amount of the debt that was enrolled in the program, and he

wouldn't have to pay anything else.  The representative said that they were going to

package his case into an offensive case with a number of other clients and they only

had a limited number of slots available. The representative said that any cases they

couldn't prove were predatory, they would be settled for pennies on the dollar.

According to the representative, from the money that he was paying to Goldberg part

of that money was to go toward the payment of the settlement for "pennies on the

dollar."

33. Shortly after this phone call, NLSS sent Ponder a link to a "Docusign" online contract

under the letterhead of Stuart Goldberg PLLC and is identified as a "Limited Scope

Legal Services Agreement.  The contract is dated on its face as 3/18/2015; however,

the effective date of the agreement per Section 3 of the agreement is upon the

execution by both parties, when both parties have signed it. Ponder never received a

copy signed by Goldberg. A copy of this document (with account numbers redacted)

is attached as **EXHIBIT 5**.   Stuart Goldberg PLLC is not a registered business name

as far as the plaintiffs have been able to tell.  Upon information and belief of

plaintiffs, it is a "doing business as" name for both K. Stuart Goldberg the individual

and K. Stuart PLLC.

34. The Limited Scope Legal Services Agreement called for Ponder to pay a "NON-

REFUNDABLE" attorney fee of $12,002, paid in monthly installments of $333.39

13

per month for 36 months. It also states that "Client understands and agrees that the Attorney may sell the Installment Note to a third party."

35. Other than the contracted amounts, the terms of the Goldberg contract with Ponder are substantially the same as the terms of the Goldberg contracts with Joseph and Bethany Castellanos with the same falsehoods and misrepresentations.

36. The contract provided a space for Ponder to list his student loan, credit card and unsecured debt accounts. The nonrefundable fee was roughly half the amount of the debt listed.  In exchange for the money paid, Goldberg listed the services that he would provide.  The contract states: "First, unlike the usual agreement, this Agreement is for a (a) **limited** legal service(s), rather than for the complete array of services that Attorney could provide to his clients in the pre-litigation and litigation phases of a dispute."  The contract also states that "the total fee will be less than it would be if Attorney was not limiting what it was to do, because the cost of legal services increases as the scope of those services increase."

37. The contract defines the "Scope of Legal Representation" as the following items (with more complete descriptions in the contract attached.)

    (vii)   Letter of Representation and Verification  (to each of the creditors identified by the client);

    (viii)  Auditing of Documents Produced;

    (ix)    Instructions to Client;

    (x)    Defensive Litigation.  "In the event litigation is initiated against Client, Attorney shall defend Client in such action with such defense [including the filing of any appeals]. Client shall only be obligated to pay the filing

fees associated with the filing of an appeal. In regards to clients not residing is the state of Florida, they shall be assigned to of counsel in their state employed by this firm." Because Ponder was not a Florida resident, and because pursuant to the Fair Debt Collection Practices Act, a collector was likely to sue him in his home state and county, this contract provision is effectively a litigation insurance policy by a company not licensed to provide insurance.

(xi)     Prosecution of Claims. "In the sole discretion of Attorney, Attorney shall prosecute any claims Client may have against any counterparty or any third party identified during the course of the limited representation."

(xii)    Settlement of Claims. "Attorney shall cause counterparties and other parties to enter into settlement and release agreements. **THERE IS NO CHARGE TO CLIENT FOR THE SERVICE OF RENEGOTIATING SETTLING, OR IN ANY OTHER WAY ALTERING THE TERMS OF ANY DEBT BETWEEN CLIENT AND ANY UNSECURED CREDITOR OR DEBT COLLECTOR, INCLUDING A REDUCTION IN THE BALANCE, INTEREST RATE OR FEES OWED. THIS SERVICE IS PROVIDED FREE OF ADDITIONAL CHARGE AND IS INCIDENTAL TO SERVICES i-V ABOVE."** This statement is part of a scheme, device or artifice with intent to mislead or defraud. It is an unsuccessful attempt to avoid coverage as a credit services organization. Since it is one of the services committed, and the other services are not itemized, there is no way to

assign consideration to any of the services offered, thus it cannot be said
or truthfully claimed that there is no charge for causing counterparties to
enter into settlement and release agreements.  As Ponder perceived the
marketing pitch by Goldberg and NLSS, the debt relief was the main thing
that they were trying to sell him, and it was his principal objective.

38.  Ponder electronically signed the DOCUSIGN contract the evening of the same day
he received the initial call.

39. The next day he received a call from a female who said she was a representative of
Goldberg, who asked if he got the welcome packet and call log, said he should talk to
her. Her name was Pam he believes.

40. From the very beginning, Ponder was required and advised to make the monthly
payments on the contract to NLSS using a Card Payment Authorization form.. Except
for one conversation with a person identifying himself as Goldberg, all of Ponder's
communications relating the contract were with National Legal Staffing Support.
Ponder does not recall ever speaking directly to attorney Mason. Upon information
and belief of the plaintiff, the entire Limited Scope Legal Services Agreement was
nothing but a sham meant to shield the operation of a traditional Credit Services
Organization from regulation and accountability by hiding behind an attorney as a
front.  Attorney Goldberg was a knowing participant in this scam and partner in this
scam even though upon information and belief, he received only a small portion of
the funds advanced by the plaintiff.  Neither attorney personally performed a
significant amount of legal services for the plaintiff. Letters sent out to the plaintiff's
creditors were form letters that were not signed by the attorneys. If any legal analysis

was performed on any prospective offensive or defensive claims, it did not result in any action on the creditor accounts of the plaintiffs. There were no account settlements and no offensive or defensive litigation during the approximately 23 months the Ponder paid into the plan.

41. The defendants attempted to convey the image to Ponder that NLSS provided support and back office as a contractor to Goldberg and Mason. Plaintiffs believe, however that National Legal Staffing Support was "calling the shots" using attorney Goldberg as a "front". National Legal Staffing received the money and paid Goldberg and Mason rather than the other way around.

42. The representative told Ponder that because the student lender was located in New York, any legal proceeding would be in New York, including defensive proceedings, and that is where they would be handling it. This is a misrepresentation. The loan was an internet loan, that Ponder electronically signed while he was in Indiana. He was living (and still is living) in Indiana at the time he was dealing with NLSS. NLSS and Goldberg knew or should have known that under the FDCPA, the student lender would have to sue Ponder in Indiana.

43. In late October 2015, Ponder received a phone call from a representative of NLSS. The representative told Ponder that his case and some others are being transferred to another lawyer for a group action against American Education Services (Ponder's student loan lender), and the new attorney is a specialist in these cases. As NLSS explained it to Ponder is that nothing would change except he would have a different representative, and that smaller AES cases would be placed in a larger case. NLSS did not tell Ponder that he had a choice in signing or not signing the new contract.

17

44.  The next day, believed to be October 28, 2015, Ponder received a new Limited Scope

Legal Services Agreement by email to be docusigned and returned. This contract was

under the letterhead of Kevin Mason, P.A. A redacted copy of this agreement is

attached and incorporated as **EXHIBIT 6**.  Except for the amounts of debt and

payment, this contract is substantially the same as those relating to Joseph and

Bethany Castellanos referenced above. Ponder's contract for Mason called for the

payment of a NONREFUNDABLE fee of $12,002.00 payable at $333.39 per month

for 36 months, in other words, the same amount as he initially agreed to pay to

Goldberg, but by the time of the Mason contract, Ponder had paid twenty-three or

twenty-four months on the Goldberg and Mason contracts.

45. The Mason contract was the result of telemarketing interstate phone conversations,

incoming and outgoing, with NLSS as agent for Mason.

46. There was no cancellation of the contract with Goldberg which was theoretically

nonrefundable and not conditional on further work by Goldberg. Taken literally,

between the two contracts, Mr. Ponder contracted to pay virtually the full amount of

his debt to the two attorneys and their assignees.  Though NLSS orally represented

that the Mason contract replaced the Goldberg contract and was effectively a

continuation of the relationship with NLSS, the contracts on their face are

independent assignable contracts with unconditional promises to pay the full amount

of the contract.

47. When Mason became involved with the plaintiffs, Mason adopted the policies and the

conduct of NLSS, and went along with the NLSS line that the contract with Goldberg

18

was still in effect. Mason therefore so far engrained himself into the operations of

NLSS that liability of NLSS is imposed upon Mason as a joint venture participant.

48. Even though Goldberg stopped being actively involved before the end of NLSS's

dealings with plaintiffs, Goldberg never resigned from representation of the plaintiffs.

Goldberg never sent an accounting or offered a refund for services not performed.

Goldberg never took corrective actions to remedy false apprehensions of continued

legal services which were continued by NLSS, and Goldberg knew or should have

known of the continued operation against the plaintiff. Goldberg is therefore liable for

actions jointly through the end of the enterprise.

49. The marketing statements of NLSS, made with knowledge and cooperation by

Goldberg and Mason misrepresented the contracts that would be signed. The

telemarketer's statements promised debt relief. The contract denied that debt relief

was a purpose of the contract.

50. The telemarketers promised that debts would be settled out of money paid under the

contract. The contract stated that the money was for only limited legal services.

51. The contracts promised legal services that the contracting attorneys could not legally

perform because they were not authorized to practice law in Indiana.

52. Ponder acted in reliance on the promises of the defendants, paid money under the

contracts, and let his student loan contract go into default under the advice of the

defendants. As a result, Ponder's finances are in shambles. Ponder is in a worse

position than he would have been otherwise with his student loan lender, and his

credit is so impaired that he can't pursue ordinary life goals.  Combined Ponder's

actual damages exceed $50,000.

19

COUNT I - TELEMARKETING AND CONSUMER FRAUD AND ABUSE PREVENTION
ACT (TCFAPA) and FTC TELEMARKETING RULE

53. All previous paragraphs are realleged.

54. The Telemarketing and Consumer Fraud and Abuse Prevention Act (TCFAPA) was
    passed by Congress and signed into law in 1994 for the purpose of curbing consumer
    fraud in interstate commerce.  The statute is codified at 15 USC 6102 et seq.

55. Section 6102 of the Act gives the FTC authority to promulgate rules proscribing
    abusive telemarketing practices.

56. Section 6104 of the statute provides a private right of action in Federal Court against
    a person who has engaged or is engaging in such a pattern or practice of
    telemarketing if the amount in controversy exceeds the sum of $50,000 in actual
    damages for each person adversely affected by such telemarketing.

57. Section 6104(b) requires notice to the Federal Trade Commission of the complaint
    except where prior notice is not feasible, in which case the person shall serve such
    notice immediately upon instituting such action.  The Federal Trade Commission has
    been notified of this action.

58. National Legal Staffing Support, LLC individually, and in a joint enterprise with the
    other defendants, engaged in a pattern and practice of telemarketing practices in
    violation of the FTC rules.  These violations resulted in actual damages to Joseph
    Castellanos in excess of $50,000. The telemarketing contact resulted in Joseph
    Castellanos incurring liability on two assignable contracts each for $31,674 each, for
    a total of $63,348.  Of this he paid $11,220. In addition, he suffered additional actual
    damages including damage to his creditworthiness, emotional distress and increased

20

interest expenses and legal expenses that will be necessary to resolve legal issues caused by the defendants' advice not to pay on creditor accounts.

59. National Legal Staffing Support, LLC individually, and in a joint enterprise with the other defendants, engaged in a pattern and practice of telemarketing practices in violation of the FTC rules.  These violations resulted in Actual damages to Bethany Castellanos in excess of $50,000. The telemarketing contact resulted in Bethany Castellanos executing two assignable contracts each for $9,905, for a total of $19,810. Of this, she paid, $4,400. In addition, she suffered additional actual damages including damage to her creditworthiness, liability to further charges by creditors, emotional distress and increased interest expenses and legal expenses that will be necessary to resolve legal issues caused by the defendants' advice not to pay on creditor accounts.  The total of all actual damages is greater than $50,0000.

60. National Legal Staffing Support, LLC individually, and in a joint enterprise with the other defendants, engaged in a pattern and practice of telemarketing practices in violation of the FTC rules.  These violations resulted in actual damages to Michael Ponder in excess of $50,000. The telemarketing contact resulted in Michael Ponder executing two assignable contracts each for #12,002 for a total of $24,004. Of this, he paid approximately $8,001. In addition, he suffered additional actual damages including damage to his creditworthiness, liability to further charges by creditors, emotional distress and increased interest expenses and legal expenses that will be necessary to resolve legal issues caused by the defendants' advice not to pay on creditor accounts.  The total of all actual damages is greater than $50,0000.

61. Through additional research, including examination of internet complaints of similar activity, and based on the general scope and magnitude of defendants' operation, plaintiffs assert that the telemarketing activities that caused their injuries are part of a pattern and practice of similar conduct by the defendants.

62. The FTC promulgated the Telemarketing Rule under the TCFAPA, a rule which is codified at 16 C.F.R. 310.

63. Defendant NLSS is a "telemarketer" for purposes of the FTC Telemarketing Rule as a person who "in connection with telemarketing, initiates or receives telephone calls to or from a customer or donor"

64. Defendants Goldberg and Mason are "Sellers" for purposes of the FTC Telemarketing rule as a "any person who, in connection with a telemarketing transaction, provides, offers to provide or arranges for others to provide goods or services to the customer in exchange for consideration."

65. All plaintiffs are "customers" for purposes of the FTC Telemarketing rule, which defines the term as a person who "is or may be required to pay for goods or services offered through telemarketing."

66. On or about April 6, 2015, an employee of NLSS, acting within the scope of his employment, with NLSS as principal or acting as an agent of defendant Goldberg, placed an autodialed interstate telemarketing call to Joseph Castellanos's cell phone without prior consent, in violation of the FTC Telemarketing Rule.  (Note that for purposes of the FTC Telemarketing Rule, it does not matter whether the call was autodialed or not.)

67. On or about March 18, 2015, an employee of NLSS, acting within the scope of his/her employment, with NLSS as principal or acting as agent of defendant Goldberg, placed an autodialed interstate telemarketing call to Michael Ponder's cell phone for telemarketing purposes.

68. The FTC Rule requires that at the outset of a telemarketing call, the telemarketer must make prompt oral disclosure regarding the identity of the seller, that the purpose of the call is to sell goods or services, and regarding the nature of the goods or services. (16 C.F.R. 310.4(d)). NLSS failed to make this disclosure to either Ponder or Castellanos.

69. The FTC Telemarketing Sales Rule prohibits telemarketers from making false or misleading statements to induce any person to pay for goods or services.  (16 C.F.R. 310.3) In this case, NLSS failed to disclose material limitations including that attorneys Goldberg and Mason were not licensed to practice law in Indiana and could not legally enter into a contract of the type. In addition, the ability of the program to eliminate the debt as claimed was misrepresented.  It was also intentionally misleading to suggest that plaintiffs could save money on their student loans and other accounts through leveraging consumer protection statutes when at the time these representations were made, there had been no inquiry by any defendant into the strengths and weaknesses of plaintiffs' claims and defenses.

70. The FTC Telemarketing Rule prohibits the telemarketer or seller from disclosing or receiving for consideration unencrypted account numbers for use in telemarketing. (16 C.F.R. 310(c)(2)) The defendants obtained unencrypted account information from billing the accounts of Joseph Castellanos and Michael Ponder.

71. The FTC Telemarketing Sales Rule contains specialized provisions relating to Debt Relief Services, including any program represented to "negotiate, settle, or alter payment terms of debt between an individual and unsecured creditors or debt collectors." (16 CFR 310(M)). The services contracted for by Bethany Castellanos, Joseph Castellanos and Michael Ponder constituted Debt Relief Services for purposes of the rule. These provisions apply to both seller or telemarketing initiated calls and to customer-initiated calls in response to advertising or a direct solicitation. The communications that resulted in the Mason contracts included both seller customer initiated calls in response to a direct solicitation and are therefore covered by the Telemarketing Sales Rule. These provisions also extend the coverage of the Telemarketing Sales Rule to Bethany Castellanos's contracts.

72. Under the FTC Telemarketing Sales Rule, 16 C.F.R. 310.4(a)(5), there is a prohibition against collection of fees before results are achieved. The contracts of each plaintiff included provisions for payment of fees before work was performed, and in fact the entire fee, half of the debt, was contractually obligated before any work was performed.

73. In addition to the standard disclosures applicable to all telemarketing transactions, additional disclosure is required in debt relief services transactions. The calls must include a statement of how long it will take to achieve the represented results (16 C.F.R. 310.3(a)(1)(viii)(A).) This disclosure was not made. The regulation states that, in cases where the services may include making a settlement offer to potential creditors, the timeframe for making the offer and the amount of money or the

percentage of debt each consumer must accumulate before the provider will make the settlement offer. 16 C.F.R. 310(3)(a)(viii).

74. The Telemarketing Sales Rule allows providers to request or require consumers to pay into an escrow account that will be used for provider's fees and for payments to creditors. If the provider does so, the seller or the telemarketer must disclose that the consumer owns the funds; the consumer may withdraw from the service at any time without penalty; if the consumer withdraws, he or she is entitled to a full refund of all money in the account other than the fees earned by the service provider in accordance with the payment provisions of the Telemarketing Sales Rule. (16 CFR 31.3(a)(1)(viii)(D))   Not only was this not done, the contract specifically said that all money immediately went to the provider upon signing of the contract with no refunds.

75. The Telemarketing Sales Rule prohibits providers from making unsubstantiated claims of savings or results.  The claims made that the defendants could prevent the creditors of the plaintiffs from collecting on their accounts were unsubstantiated.

**Wherefore,** the plaintiffs suffered actual damages in terms of the money paid and contractual obligations incurred, the amount of money paid, damage to their credit rating and other consequential financial loss, and emotional distress.  To the extent the Mason and Goldberg contracts were assignable and created a facial obligation to the assignee, and the contracts were assigned, actual damages include the entire amount of the contracts. In addition to monetary damages, plaintiffs seek declaratory relief that the "Limited Scope Legal Services" agreements are void, injunctive relief on the sale and transfer of the contracts, attorney fees and costs and such other relief as justice requires.

COUNT II – TELEPHONE CONSUMER PRIVACY ACT (TCPA) (47 USC 227)

76.  All previous paragraphs are realleged.

77. Defendants, NLSS and Goldberg (as declared principal) on or about 4/6/2015 called the plaintiff Joseph Castellanos on his cellular phone for telemarketing or commercial purpose using an automatic telephone dialing system. Defendants NLSS and Goldberg (as declared principal) on or about 3/18/2015 called plaintiff Michael Ponder on his personal cellular phone for telemarketing or commercial purposes using an automatic telephone dialing system.

78. Neither Joseph Castellanos nor Michael Ponder had a prior relationship with the defendant, and calls were made without prior written consent.

79. Plaintiff suffered actual damages related to this call and is entitled to claim statutory damages of $500-1500.

80. The extent of actual damages recoverable under the Telephone Consumer Privacy Act appears to be uncertain.  Plaintiffs claim all financial and other actual damages resulting from the calls and the contracts the calls enabled.

**Wherefore**, Plaintiff Joseph Castellanos and Michael Ponder claim actual damages in the amount of $500-1500 per plaintiff and any other actual damages or relief just and necessary.

COUNT III - INDIANA CREDIT SERVICES ORGANIZATIONS ACT (ICSOA) (I.C. 24-5-15-1 et seq.)

81. Bethany and Joseph Castellanos are "buyers" for purposes of the ICSOA, which defines a buyer as an "individual who is solicited to purchase or who purchases the services of a Credit Services organization.

82. Michael Ponder is a "buyer" for purposes of the ICSOA, which defines a buyer as an "individual who is solicited to purchase or who purchases the services of a Credit Services organization.

83. NLSS, Kevin Mason (personally) and K. Stuart Goldberg (personally) are a "Credit Services Organization" for purposes of the ICSOA, which defines a credit services organization as "a person that, with respect to the extension of credit by another person, sells, provides, performs, or represents that the person will sell, provide, perform, in return for the payment of money or other valuable consideration any of the following services.  The subsets of this statute alleged in this case are (1) Improving a buyer's credit record, credit history or credit rating, (5) providing debt settlement services on behalf of a buyer and (6) Providing advice or assistance to a buyer concerning the services described in subdivisions (1) through (5).

84. The defendants were not admitted to practice law in Indiana. The defendants were not acting within the scope of their practice as an attorney.

85. Defendants committed the following deceptive acts as specified by IC 24-5-15-5, specifically defendants charged or received money or other valuable consideration before the complete performance of services that a credit services organization has agreed to perform for or on behalf of a consumer without posting a bond or irrevocable letter of credit. (IC 24-5-15-5(1).

86. IC 24-5-15-6 requires that a Credit Services Organization provide to a buyer before executing a contract or receiving money a written statement which has nine items. This was not provided to any of the plaintiffs.

87. IC 24-5-15-7 mandates that a contract between a consumer and a credit services organization contain a notice of a three day right of cancellation and a mandatory cancellation form. This notice and cancellation form were not present on any of the contracts executed by any of the plaintiffs.

88. The defendants did not execute a surety bond or irrevocable letter of credit as required by IC 24-5-15-8.

89. IC 24-5-15-9 provides that a person who is damaged by a credit services organization may bring an action to recover the greater of two times the amount of actual damages or $10,000 plus attorney fees.

90. Bethany Castellanos, Joseph Castellanos and Michael Ponder each incurred actual damages in the form of potential liability under two contracts in an amount substantially equal to their entire debt, funds actually paid to the defendants, enhanced debt and extra charges due to the advice of the defendants to cease payments on accounts that the defendants promised to grant relief on, increased interest and impairments to credit rating, emotional distress, potential additional legal expenses to deal with creditor issues that could have been avoided had funds paid to the defendants been available to settle their accounts.

**Wherefore**, plaintiffs claim double their actual damages as proved plus attorney fees.

COUNT IV – INDIANA DECEPTIVE CONSUMER SALES ACT (IDCSA) IC 24-5-0.5-1 et
seq. AND COMMON LAW FRAUD.

91. All previous paragraphs of the complaint are realleged

92. The contracts between the plaintiffs and the defendants are "Consumer transactions"
for purposes of the IDCSA.

93. Each of the defendants individually and in combination are "Suppliers" for purposes
of the IDCSA.

94. Each of the suppliers committed unfair, abusive and/or deceptive acts and/or
omissions in connection with consumer transactions involving the plaintiffs, these
acts included (1) representations that the subject of the consumer transaction had
characteristics or benefits that it does not have and the supplier knows or should
reasonably know it does not have.  Specifically, that the suppliers had the ability to
shield the plaintiffs from having to pay the debts that were enrolled in the program,
that the supplier was authorized to offer these services, that the attorney had made a
determination that the plaintiffs had sufficient substantive grounds to withhold
payments on debts under consumer protection statutes when the attorney had done no
analysis of the plaintiff's position and the attorney knew this.  That the attorney
would review the facts and law applicable to plaintiff's accounts and would use that
information to defend and negotiate out plaintiff's accounts when they knew that they
would not.   In the case of Goldberg, Goldberg ceased working on the case knowing
he had not handled the plaintiff's accounts, and did not notify plaintiffs of an intent to
withdraw or offer to refund money for work not performed.

95. Each of the suppliers misrepresented to the consumers that the attorney fees charged were nonrefundable when the attorneys would have been forced to refund money for work that had not been accomplished.

96. Each of the attorneys represented to the plaintiffs that National Legal Staffing Support worked for the attorney when in actuality the attorneys either de-facto or de-jure worked for NLSS. NLSS handled the money and paid the attorneys.  The attorneys performed little or no legal work for the consumers and performed little to no supervision over the non-lawyer employees of NLSS.

97. Defendants misstated the attorney services that were actually being performed. The defendants misstated the history of their dealings of handling consumer debts and the success rate and expectations of those claims. The defendants misrepresented that they would send out dispute letters to credit reporting agencies. Defendants misrepresented that National Legal Staffing Support was working under the control of the attorneys.

98. All of this effectively amounted to a scheme, device or artifice with intent to defraud and constituted incurable deceptive for purposes of the Indiana Deceptive Consumer Sales Act.

99. A violation of the Indiana Credit Services Organization Act is a violation is a deceptive act for purposes of the Indiana Deceptive Consumer Sales Act pursuant to IC 24-5-0.5-3(b)(28).

100.    Plaintiffs relied on these deceptive acts and suffered actual damages in the form of contractual liability incurred, money actually paid, additional money and penalties owed to creditors due to following the directions of the defendants, damage to credit

rating, emotional distress, and potential additional legal fees which may be incurred before this action is resolved, plus miscellaneous loss.

**Wherefore**, plaintiffs claim three times actual loss for incurable deceptive act pursuant to IC 24-5-0.5-04, plus attorney fees and any other relief just and proper, or in the alternative, relief for common law fraud including actual damages and punitive damages and any other relief just and proper.

JURY TRIAL DEMANDED FOR ALL COUNTS TRIABLE BY JURY

RESPECTFULLY SUBMITTED,

*/S/ Steven R. Hofer*

Steven Hofer
Attorney for the Plaintiffs

Steven R. Hofer
Consumer Law Office of Steve Hofer
8888 Keystone Crossing, Suite 1300
Indianapolis IN 46240
(317) 662-4529
hoferlawindy@gmail.com
Bar # 11584-49

I certify a copy of the foregoing was served to all parties by CM/ECF on this 5th day of July 2017.

*/S/ Steven R. Hofer*
Steven R. Hofer